[Cite as *State v. Farrell*, 2021-Ohio-1554.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio/City of Bowling Green          Court of Appeals No. WD-20-044

      Appellee                                Trial Court No. 19TRC07227

v.

 Daniel W. Farrell                           **DECISION AND JUDGMENT**

      Appellant                               Decided:  April 30, 2021

* * * * *

Hunter Brown, Bowling Green City Prosecutor, and
Nicholas P. Wainwright, for appellee.

Blaise Katter and D. Timothy Huey, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Daniel Farrell, appeals the May 13, 2020 judgment of the

Bowling Green Municipal Court sentencing him for a misdemeanor conviction of

operating a vehicle under the influence of alcohol ("OVI").  For the following reasons,

we reverse.

## I. Background and Facts

{¶ 2} After a traffic stop on September 15, 2019, Farrell was arrested and charged with operating a vehicle while under the influence of alcohol in violation of R.C. 4511.19(A)(1)(a), a first-degree misdemeanor; driving with a prohibited breath-alcohol concentration ("BAC") in violation of R.C. 4511.19(A)(1)(d), a first-degree misdemeanor; and failing to approach a stationary public safety vehicle displaying emergency lights with caution in violation of R.C. 4511.213, a minor misdemeanor. The traffic citation filed with the trial court shows that Farrell's BAC was .152, almost twice the legal limit of .08.

{¶ 3} On December 23, 2019, Farrell filed a motion to suppress the evidence obtained from the traffic stop. Although Farrell's motion argued for the suppression of the traffic stop and all evidence obtained from it, by the time of the February 20, 2020 suppression hearing, he had narrowed the scope of his motion to include only the results of his breathalyzer test on the basis that his breath sample was not obtained in compliance with the regulations promulgated by the Ohio Department of Health ("ODH"). Specifically, Farrell claimed that the canister of dry gas used in the Intoxilyzer 8000 breathalyzer machine that tested his BAC was not traceable to National Institute of Standards and Technology ("NIST") standards, as required by Ohio Adm.Code 3701-53-04.

{¶ 4} At the outset, some definitions are necessary for a complete understanding of the issues in this case, which involve "metrology"—i.e., "the science of weights and

2.

measures or of measurement." *Merriam Webster's Collegiate Dictionary* 732 (10th Ed.1996). According to an NIST publication that was admitted as defendant's exhibit No. 4 at the suppression hearing, the "Supplementary Materials for NIST Policy Review" ("NIST supplement"), "NMI" means national metrology institute, which is a governmental organization responsible for maintaining a country's standard measurements. *See* National Institute of Standards and Technology, *Supplementary Materials for NIST Policy Review* (Apr. 29, 2019), I.C.1. NIST is the NMI for the United States. *Id.* The "Mutual Recognition Arrangement" (referred to in the dry gas certificate of analysis, which was admitted as defendant's exhibit No. 1 at the suppression hearing, and by the parties as a "mutual recognition agreement") is an agreement among the NMIs of different countries to help establish the degree of equivalence of national measurement standards, provide for mutual recognition of calibration and measurement certificates issued by NMIs, and provide a secure technical foundation for international trade, commerce, and regulation. *Id.* at I.E.1.

{¶ 5} At the hearing, the city called only one witness to testify. Frank Nedveski, an ODH inspector for alcohol and drug testing, testified that his job entailed "recertifying and installing I-8000 Intoxilyzers, breath testing instrument * * *," training police officers to use breathalyzer machines, and recertifying officers to keep their breathalyzer permits current.

{¶ 6} Nedveski said that the breathalyzer used in Farrell's case was an "Intoxilyzer I-8000," which Nedveski had "certified [] for use by officers." He explained that an

3.

Intoxilyzer 8000 requires the test subject to provide two breath samples. The machine analyzes the amount of infrared light absorbed by each breath sample to determine the sample's alcohol content, and then prints the lower of the two BAC results as the test subject's BAC. The Intoxilyzer 8000 uses a substance called "dry gas" as a "self-check" before the test subject provides his first breath sample and after he provides his second breath sample "to ensure the instrument is working properly." When he is certifying an Intoxilyzer 8000, Nedveski will exchange the dry gas tank if the tank is low on gas or is near its expiration date. Also during the certification, the Intoxilyzer 8000 "does two self dry gas tests; and it must pass within a tolerance of plus or minus 005."

{¶ 7} During Nedveski's testimony, the prosecutor presented him with defendant's exhibit No. 1, which Nedveski identified as "a certification analysis of the dry gas." He explained that a certificate of analysis "accompanies the dry gas cylinders when we purchase them, that the value of the dry gas is 100, and then it has a NIST traceable of 101. We recognize that both are valid testing with the value of 100 into the [Intoxilyzer] 8000." Based on the information in the certificate of analysis, Nedveski said that the dry gas was "[a]cceptable. It passed the cert." When he is certifying an Intoxilyzer 8000, Nedveski checks to make sure that the lot number on the dry gas cylinder matches the lot number on the certificate of analysis and that the dry gas does not expire for approximately one year. Nedveski did not provide any explanation of the dry gas certification process. He did, however, confirm that the dry gas cylinder referred to in the exhibit was the same cylinder that was used during Farrell's breathalyzer test.

4.

**{¶ 8}** The certificate, marked as defendant's exhibit No. 1, is a certificate of analysis for DRYGAZ ethanol breath standard, which is a mixture of ethanol and nitrogen. It is issued by the manufacturer of DRYGAZ, and accompanies the dry gas cylinders that ODH purchases. The certificate shows that the "BrAC" value for the ethanol in the DRYGAZ is "0.100" and the "AVERAGE ANALYTICAL VALUE" of the "BrAC" of the ethanol in the DRYGAZ is "0.101." The certificate includes several statements about traceability. First, it states that its "REFERENCE STANDARD" is "N.M.I. TRACEABLE STANDARDS," which it defines as "CERTIFICATION TRACEABLE TO National Metrology Institute Traceable Standards." Under the heading "TRACEABILITY," the certificate has two different statements, one for "Preparation" and one for "Analytical." The "[p]reparation" statements reads, "Gas mixtures manufactured with balances calibrated by an ISO 17025 accredited company using NIST traceable weights and meets or exceed the requirements of NIST handbook 44." In contrast, the "[a]nalytical" statement says only that "Analytical Instruments Calibrated Using NMI Traceable Standards." The certificate also notes that "NMI is recognized by NIST through the Mutual Recognition Agreement (CIPM MRA)," but it does not identify the NMI with any more specificity.

**{¶ 9}** On cross-examination, Farrell's attorney clarified with Nedveski that Nedveski was trained in operating, maintaining, and repairing breathalyzers, but his training did not extend to chemistry or testing methods for dry gas. As counsel summarized it, "So basically * * * they gave you a * * * dry gas cylinder, and you

5.

plugged that thing into the machine. And it comes with a piece of paper, and * * * it's not part of your training and background to interpret that for the courts or anything?" Nedveski responded, "I have no background to challenge the method of their testing." Later, as counsel asked Nedveski about two other exhibits—defendant's exhibit No. 3, a document titled "NIST Policy on Metrological Traceability" ("NIST policy"), and defendant's exhibit No. 4, the NIST supplement—Nedveski reiterated that he did not "have the education background to call [NIST] up and say they did something wrong."

{¶ 10} In its written closing argument, the city argued that it had the burden of showing substantial compliance with the regulations governing breathalyzer tests, which it had done through Nedveski's testimony and the exhibits. The certificate of analysis showed that the DRYGAZ was "'NMI' Traceable" and "NMI is recognized [by NIST] through the Mutual Recognition Agreement."

{¶ 11} In his written closing argument, Farrell argued that the city failed to show strict compliance with Ohio Adm.Code 3701-53-04(B), (C), and (D) because it could not show that the dry gas used in his breathalyzer test was traceable to NIST standards. He claimed that the manufacturer's certificate of analysis, which accompanied the DRYGAZ canister upon purchase, showed that the gas was traceable to NMI standards, but that is not the equivalent of traceability to NIST standards. Because the city failed to show that it had complied with the applicable regulations, he argued, the results of his breath test must be suppressed.

6.

{¶ 12} The trial court denied Farrell's motion to suppress. In its decision, it found that "use of the dry gas similar to that in [Farrell's] test and previously approved by the Ohio Department of Health substantially complied with the ODH regulations for Intoxilyzer 8000 instruments." The court also determined that Farrell had presented "no expert testimony that the language on the dry gas certificate in defendant's exhibit No. 1 meant that the gas in question was not traceable to NIST standards." The court concluded that the city had shown substantial compliance with Ohio Adm.Code 3701-53-04(B), (C), and (D) because "[a]pparently the manufacturer of the dry gas sufficiently proved the gas's traceability to NIST to the ODH which approved the gas." The court also found that Farrell had not shown that he was prejudiced by a lack of strict compliance with the regulations. Accordingly, the court denied Farrell's motion to suppress.

{¶ 13} Following the denial of his motion to suppress, Farrell pleaded no contest to an amended charge of OVI in violation of Bowling Green Code 73.01(A)(1)(d), the equivalent of R.C. 4511.19(A)(1)(d). The trial court found him guilty and sentenced him to a suspended jail term, a driver-intervention program, probation, a fine, and costs.

{¶ 14} Farrell appeals his conviction, raising one assignment of error:

The Trial Court Erred in Overruling the Motion to Suppress[.]

## II. Law and Analysis

{¶ 15} In his assignment of error, Farrell argues that the trial court erred in denying his motion to suppress because the city failed to show any compliance with Ohio

7.

Adm.Code 3701-53-04(B), (C), and (D), which require that the dry gas standard used in the Intoxilyzer 8000 be traceable to NIST standards. He claims that the exhibits submitted at the suppression hearing show that (1) the dry gas used in his breathalyzer test was traceable to an NMI, not NIST, (2) traceability to an NMI is not necessarily the equivalent of traceability to NIST, (3) the city did not show in this case that traceability of the dry gas to some unknown NMI was the equivalent of traceability to NIST, and (4) because the city failed to show that the dry gas was traceable to NIST, it also failed to show compliance with Ohio Adm.Code 3701-53-04.

{¶ 16} The city responds that it met its burden of showing substantial compliance with the regulations because Nedveski testified that the cylinder of dry gas that he installed in the Intoxilyzer 8000—which was in use at the time of Farrell's breathalyzer test—was provided to him by ODH and, as far as Nedveski was aware, the dry gas met the requirements for certification. The city argues that we are required to defer to ODH's choice of dry gas and cannot "question[] the legitimacy of preapproved ODH Solutions and Methods." The city also argues that the "Governing Case Law on this Issue * * *" shows that DRYGAZ complies with Ohio Adm.Code 3701-53-04.

### A. Standard of review

{¶ 17} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. The trial court acts as the trier of fact at a suppression hearing by weighing the evidence and determining the credibility of the witnesses. Although we must accept any findings

8.

of fact that are supported by competent, credible evidence, we conduct a de novo review to determine whether the facts satisfy the applicable legal standard, and this independent review is done without deference to the trial court. *State v. Codeluppi*, 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, ¶ 7, citing *Burnside* at ¶ 8; *State v. Jones-Bateman*, 6th Dist. Wood Nos. WD-11-074 and WD-11-075, 2013-Ohio-4739, ¶ 9.

{¶ 18} In R.C. 4511.19(D)(1)(b), the legislature made the results of a breath-alcohol test presumptively admissible, provided that the sample is "analyzed in accordance with methods approved by the director of health * * *" and the analysis is conducted by a person with the appropriate permit issued by the director of ODH. The legislature also gave the director of ODH the authority to determine and approve "satisfactory techniques or methods" for analyzing the amount of alcohol in a person's breath, set the qualifications for those who may conduct breath-alcohol analyses, and issue permits to those who qualify to conduct breath-alcohol analyses. R.C. 3701.143.

{¶ 19} To trigger the presumption of admissibility in R.C. 4511.19(D)(1)(b), the state must establish that it substantially complied with the alcohol-testing regulations promulgated by ODH. *Burnside* at ¶ 27. The requirement that the state show substantial (rather than strict) compliance with the regulations "does not relieve the state of its burden to prove compliance with the alcohol-testing regulations, but rather defines *what compliance is*." (Emphasis sic.) *Id.* In other words, "*compliance with the regulations* * * * is the criterion for admissibility." (Emphasis sic.) *Id.* at ¶ 32. If the state shows that it substantially complied with the applicable regulations, the results of the alcohol

9.

test are presumptively admissible, and the burden shifts to the defendant to rebut the presumption by demonstrating that he was prejudiced by the state's failure to strictly comply with the regulations. *Id.* at ¶ 24.

{¶ 20} Although the Ohio Supreme Court has determined that "rigid compliance with the Department of Health regulations is not necessary for test results to be admissible[,]" it has also "limit[ed] the substantial-compliance standard * * * to excusing only errors that are clearly de minimis" or that can be characterized as "'minor procedural deviations.'" *Id.* at ¶ 34, citing *State v. Steele*, 52 Ohio St.2d 187, 370 N.E.2d 740 (1977); and quoting *State v. Homan*, 89 Ohio St.3d 421, 426, 732 N.E.2d 952 (2000).

{¶ 21} By adopting this standard, the Supreme Court sought to prevent lower courts from making judicial determinations of whether the state's compliance with alcohol-testing regulations affected the reliability of alcohol-test results. It did this to prevent the courts from "second-guessing whether the regulation with which the state has not complied is necessary to ensure the reliability of the alcohol-test results" and "usurping a function that the General Assembly has assigned to the Director of Health * * *"—i.e., "ensur[ing] the reliability of alcohol-test results * * *"—which the court deemed prudent because the director of ODH "possesses the scientific expertise that [a court] does not." *Id.* at ¶ 32, 34.

{¶ 22} The regulations that the director of ODH promulgated related to alcohol testing are in Ohio Adm.Code Chapter 3701-53. Pertinent to Farrell's case, ODH has approved the Intoxilyzer 8000 as a breath-alcohol testing instrument. Ohio Adm.Code

3701-53-02(A)(3). The specific performance standards for the Intoxilyzer 8000 are found in Ohio Adm.Code 3701-53-04(B), which states, as relevant here:

> Instruments listed under paragraph (A)(3) of rule 3701-53-02 of the Administrative Code [i.e., the Intoxilyzer 8000] shall automatically perform a dry gas control using a dry gas standard *traceable to the national institute of standards and technology (NIST)* before and after every subject test. For purposes of [the Intoxilyzer 8000], a subject test shall include the collection of two breath samples. A dry gas control is not required between the two breath samples. (Emphasis added.)

The regulation also requires the use of dry gas traceable to NIST any time "[r]epresentatives of the director" of ODH "perform an instrument certification on * * *" the Intoxilyzer 8000, which must be done "no less frequently than once every calendar year or when the dry gas standard on the instrument is replaced, whichever comes first." Ohio Adm.Code 3701-53-04(C). When an Intoxilyzer 8000 is first placed into service or is returned to service following repairs, an ODH representative must perform the same type of certification required by Ohio Adm.Code 3701-53-04(C)—i.e., one that includes a "dry gas control using a dry gas standard traceable to the national institute of standards and technology * * *"—before the machine can be used for breath-alcohol tests. Ohio Adm.Code 3701-53-04(D).

11.

## B. The city failed to meet its burden of showing substantial compliance with Ohio Adm.Code 3701-53-04.

{¶ 23} At the suppression hearing, the city did not present any testimony regarding the traceability of the dry gas used in the Intoxilyzer 8000 at issue. The city's only witness, Nedveski, testified that he could not give an opinion on traceability. Thus, the only evidence we have regarding traceability is the documentary evidence submitted as exhibits: the DRYGAZ certificate of analysis (exhibit No. 1); a certificate of analysis from a canister of ILMO brand dry gas that expired in 2014 (exhibit No. 2); the NIST policy (exhibit No. 3); and the NIST supplement (exhibit No. 4).

{¶ 24} As an initial matter, we address the city's argument that we must defer to ODH and accept its choice of dry gas without question. Although the Ohio Supreme Court has recognized that the director of ODH has scientific expertise superior to that of the judiciary, *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 32, and we agree that courts "cannot undercut [ODH's] rulemaking authority * * *" by ignoring or adding to the requirements of validly-adopted regulations, *State v. Yoder*, 66 Ohio St.3d 515, 518, 613 N.E.2d 626 (1993), courts are not required to blindly accept the truth of the information that the state presents simply because it involves science. Rather, the state is required to "establish that it substantially complied with the alcohol-testing regulations to trigger the presumption of admissibility" in R.C. 4511.19(D)(1)(b). *Burnside* at ¶ 27.

12.

{¶ 25} Contrary to the city's argument, this is not a case where we, as a court, are looking at compliance with Ohio Adm.Code 3701-53-04 to make a determination about the reliability of the test result, thereby second-guessing a scientific decision made by the director of ODH in implementing a regulation regarding alcohol testing. Rather, as instructed in *Burnside,* we are looking at the contents of the regulation to see if the city has demonstrated that it substantially complied with the requirements of the regulation when it administered Farrell's breathalyzer test. *Burnside* at ¶ 32 ("[C]ompliance with the regulations * * * is the criterion for admissibility." (Emphasis omitted.)). Indeed, in this particular case, because the city did not present the testimony of any witnesses to elucidate whether the dry gas used in Farrell's breath test was traceable to NIST, the question of substantial compliance comes down to interpretation of the regulation and the documentary evidence submitted at the suppression hearing—a task to which the courts are particularly well-suited.

{¶ 26} Turning to the evidence before the trial court, the DRYGAZ certificate of analysis plainly stated that the "CERTIFICATION [was] TRACEABLE TO *National Metrology Institute Traceable Standards*." (Emphasis added.) Equally plain is Ohio Adm.Code 3701-53-04(B)'s requirement that the Intoxilyzer 8000 "perform a dry gas control using a dry gas standard *traceable to the national institute of standards and technology (NIST) * * *."* (Emphasis added.) The question, then, is whether traceability to "National Metrology Institute Traceable Standards" is substantially the same as traceability to NIST standards. Or, in other words, is traceability to "National Metrology

Institute Traceable Standards" rather than NIST standards no more than a "clearly de minimis" error or a "'minor procedural deviation[].'" *Burnside* at ¶ 34.

{¶ 27} According to the NIST policy, "[m]etrological traceability requires the establishment of an unbroken chain of calibrations * * * to specified references." Although NIST "assures the traceability of measurement results that NIST itself provides, * * * [o]ther organizations are responsible for establishing the traceability of their own results to those of NIST or other specified references." It is official NIST policy that "providing support for a claim of metrological traceability of the result of a measurement is the responsibility of the provider of that result * * *." The NIST policy also "[c]ommunicates, especially where claims expressing or implying the contrary are made, that NIST does not * * * certify metrological traceability * * * of the results of measurements except those that NIST itself provides, either directly or through an official NIST program or collaboration."

{¶ 28} The NIST supplement goes into much greater detail about metrological traceability and when a measurement is—or is not—traceable to NIST standards. Of importance here is the discussion of the Mutual Recognition Arrangement ("MRA"). The NIST supplement explains that the MRA is an agreement among the NMIs that are members of the International Committee on Weights and Measures. In short, the arrangement allows member NMIs to recognize and accept as equivalent the measurements established by the NMIs of all other member countries. Section I.E.2. of the NIST supplement directly addresses whether measurements that are traceable to

14.

standards maintained by one signatory NMI are also traceable to standards maintained by another signatory NMI:

> While signatory NMIs (including NIST) recognize the validity of other signatories' measurement and calibration certificates under the MRA, *such recognition does not mean that measurement results obtained by one signatory NMI are automatically traceable to stated references developed and maintained by any other signatory NMI.* However, users of measurement results * * * may well decide that sufficient evidence exists under the MRA to provide mutually acceptable traceability of these results to the standards and measurements of two or more participating NMIs. (Emphasis added.)

**{¶ 29}** The information in section I.E.2. of the NIST supplement tells us two things: (1) metrological traceability of measurement results to standards maintained by some unspecified NMI—even one that is a signatory to the MRA—does not automatically result in traceability to NIST standards and (2) the proponent of the measurement is free to decide that the MRA provides sufficient evidence of "mutually acceptable traceability" between the other NMI's standards and NIST's standards. Essentially, traceability to another NMI that is an MRA signatory is not definitively synonymous with traceability to NIST. Rather, NIST allows the proponent of the measurement to articulate *why* its reference to standards maintained by another signatory NMI is sufficient to support its claim of traceability to NIST standards. Importantly, both

15.

the NIST policy and the NIST supplement clearly state that the proponent of the measurement has the burden of showing that its measurement is traceable to NIST standards.

{¶ 30} So, to summarize, the trial court had before it evidence that the dry gas used in Farrell's breath test was traceable to some unnamed NMI that was a signatory to the MRA, as well as policy statements from NIST that explained (1) the proponent of the measurement is responsible for showing its traceability to NIST and (2) traceability to an NMI that NIST recognizes through the MRA does not necessarily equate to traceability to NIST. Missing from the evidence before the trial court, however, is any testimony or documentary evidence establishing that the NMI standard at issue here—i.e., the "National Metrology Institute Traceable Standards" in the DRYGAZ certificate of analysis—is the equivalent of NIST traceable standards. There is no evidence that DRYGAZ or ODH accepted the unnamed NMI's standards as sufficient to show traceability to NIST, as permitted by section I.E.2. of the NIST supplement. The city's only witness, Nedveski, was not able to testify about traceability; he testified only that (1) he put the canister of DRYGAZ associated with the certificate of analysis in the Intoxilyzer 8000 used for Farrell's breath test; (2) he got the canister of DRYGAZ from ODH, and, to the best of his knowledge, the dry gas was approved by ODH; and (3) the Intoxilyzer 8000 passed certification with the canister of DRYGAZ installed.

{¶ 31} Based on this evidence, we cannot say that the city demonstrated in this case that it used "a dry gas control using a dry gas standard traceable to the national

16.

institute of standards and technology (NIST) * * *,'" as required by Ohio Adm.Code 3701-53-04.

{¶ 32} The next question we must address is whether the city's use of dry gas traceable to "National Metrology Institute Traceable Standards" rather than NIST standards substantially complies with Ohio Adm.Code 3701-53-04. Although "strict" or "rigid" compliance with the regulation is not required, the Supreme Court has limited the substantial-compliance standard to "excusing only errors that are clearly de minimis" or that can be characterized as "'minor procedural deviations.'" *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 34. Even cursory readings of the NIST policy and the NIST supplement show that the field of metrology, generally, and metrological traceability, specifically, are highly precise, technical, and exacting in nature. On that basis—and given that the record lacks any testimony regarding the traceability of the dry gas at issue—we cannot say that the use of dry gas that is traceable to different metrological standards than those required by Ohio Adm.Code 3701-53-04 was a de minimis error or a minor procedural deviation.

{¶ 33} In *Burnside*, the Supreme Court held in the context of the state's failure to use a solid anticoagulant in a blood-alcohol test that "[a] court infringes upon the authority of the Director of Health when it holds that the state need not do that which the director has required." *Burnside* at ¶ 33. Although this case involves the regulation related to breath-alcohol tests, the same logic applies. Here, the director of ODH unambiguously *required* the Intoxilyzer 8000 to use a dry gas standard that was traceable

to *NIST standards*. The evidence in this case shows that the dry gas was traceable to unspecified *NMI standards*, but does *not* show that those NMI standards and NIST standards are equivalent or interchangeable. Without that critical link, we cannot find that the city met its burden of demonstrating that Farrell's breath test was administered in substantial compliance with Ohio Adm.Code 3701-53-04.

{¶ 34} The city argues that "Governing Case Law" shows that DRYGAZ complies with ODH alcohol-testing regulations, and urges us to adopt the reasoning of the three municipal court cases that the trial court relied on in its suppression decision: *State v. Johnson*, Lima M.C. No. 19 TRC 07793 (Jan. 24, 2020); *State v. Lee*, Wadsworth M.C. No. 18 TRC 04104 (Dec. 4, 2019); and *State v. Bennett*, Marietta M.C. No. 18 TRC 8484(A-C) (Sept. 5, 2019). Each court found that the state substantially complied with Ohio Adm.Code 3701-53-04 when using DRYGAZ in an Intoxilyzer 8000. *See id.* As an initial matter, these are municipal court cases and, therefore, they not "governing case law" for purposes of our analysis. Regardless, we find these cases to be distinguishable.

{¶ 35} In *Johnson*, the defendant relied on an older certificate of analysis from DRYGAZ that "clearly stated 'certification traceable to N.I.S.T. RMG ethanol standards'" to support his argument that the change of language on the certificate of analysis for the newer canister of dry gas used in his breathalyzer test—which stated "'Certification traceable to National Metrology Institute Traceable Standards * * *

18.

NMI is recognized by NIST through the Mutual Recognition Agreement (CIPM MRA)'"—meant that the newer canister of dry gas was not traceable to NIST. The Lima Municipal Court found that there was "no evidence on whether this change of language is of significance in metrological traceability * * *" and that the NIST policy manual that the defendant submitted as an exhibit did not directly address whether the change of language was of any import. The court also "presume[d] that the Ohio Department of Health was aware of the change and found it to be insignificant." The court found that this was sufficient to show substantial compliance with Ohio Adm.Code 3701-53-04.

{¶ 36} Farrell's arguments in this case do not rely on changed language in the DRYGAZ certificate of analysis, so we find that *Johnson* is distinguishable.

{¶ 37} In *Lee*, the state presented the testimony of Jeanna Walock, who was the "Drug and Alcohol Testing Administrator for the Alcohol and Drug Testing Program at the Ohio Department of Health" and who the court qualified as an expert in forensic toxicology. Walock specifically testified that the dry gas at issue was traceable to NIST in two ways. First, she testified "consistent with the certificate of analysis * * * that the gas mixtures manufactured with balances calibrated by an ISO 17025 accredited company using NIST traceable weight and meets the requirements of the NIST handbook." Walock also testified that "the dry gas was traceable to the NIST standards and the analytical instruments were calibrated using NMI traceable standards, which is recognized by NIST through a Mutual Recognition Agreement." Essentially, Walock— an ODH administrator who was also an expert in forensic toxicology—testified that the

19.

information on the DRYGAZ certificate of analysis demonstrated traceability to NIST. The Wadsworth Municipal Court found that this was sufficient to show that the state met its burden of demonstrating substantial compliance with Ohio Adm.Code 3701-53-04, and that the defendant had not rebutted Walock's testimony.

{¶ 38} Similarly, in *Bennett*, the Marietta Municipal Court found that the certificate of analysis presented by the state showed that the dry gas at issue was "'N.M.I. Traceable' not NIST traceable," but that the certificate also stated that "'NMI is recognized by NIST through the Mutual Recognition Agreement (CIPM MRA).'" Although the court found that "[t]he testimony from the State's witnesses is a bit circular * * *[,]" it ultimately determined that the state's witnesses showed that ODH chose the particular brand of dry gas at issue and that "the U.S., through NIST, is a signatory to the National Metrology Institute Agreement." Because the court was "directed * * * to defer to the decisions of the Ohio Director of Health[,]" the court found that the state had shown substantial compliance with Ohio Adm.Code 3701-53-04.

{¶ 39} Unlike this case, there is no indication that the municipal courts in *Lee* and *Bennett* were presented with the NIST policy or NIST supplement. In addition, the state presented witnesses who were competent to testify on the issue of traceability in both *Lee* and *Bennett*. Here, the city did not present any testimony from anyone that the information on the DRYGAZ certificate of analysis should be interpreted to mean that the dry gas in that canister was traceable to NIST standards, rather than NMI standards as the certificate states. And, as explained above, Farrell's exhibits, standing alone, show

20.

that the certificate of analysis is insufficient to demonstrate that the dry gas in this case is traceable to NIST. Because the courts in *Lee* and *Bennett* had testimony before them regarding the traceability of the dry gas that the trial court in this case did not—and because the trial court in this case had certain documentary evidence (i.e., the NIST policy and NIST supplement) that the courts in *Lee* and *Bennett* did not—we find that they are distinguishable. *See also State v. Engler*, 11th Dist. Lake No. 2020-L-055, 2021-Ohio-902, ¶ 50 (trial court's error in conducting its own research on NIST and NMI equivalence was harmless where the record contained evidence "that the dry gas used had a traceability to NIST * * *"; Walock testified that the certificate of analysis "'provides an unbroken chain of traceability back to NIST standards[,]'" and an ODH inspector testified that the dry gas sample that he used to certify the breathalyzer "was prepared using NIST standards and that it was also traceable to NMI standards.").

{¶ 40} Because the evidence before the trial court did not support its finding that the state substantially complied with Ohio Adm.Code 3701-53-04, we find that the court erred in failing to suppress the results of Farrell's breathalyzer test. Accordingly, we find his assignment of error well-taken.

### III. Conclusion

{¶ 41} Based on the foregoing, the May 13, 2020 judgment of the Bowling Green Municipal Court is reversed, and Farrell's conviction is vacated. The city is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.             _____

                                                         JUDGE

Christine E. Mayle, J.

                                        _____

Myron C. Duhart, J.                              JUDGE
CONCUR.

                                        _____

                                                         JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.