[Cite as *State v. Murphy*, 2023-Ohio-1419.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio/Bowling Green                    Court of Appeals No.  WD-22-058

    Appellee                                   Trial Court No.  22TRC00616

v.

Jack Murphy                                    **DECISION AND JUDGMENT**

    Appellant                                  Decided:  April 28, 2023

* * * * *

Alyssa M. Blackburn-Dolan, City of Bowling Green
Prosecuting Attorney, and Nicholas P. Wainwright,
Assistant Prosecuting Attorney, for appellee.

Andrew Schuman, for appellant.

* * * * *

**SULEK, J.**

{¶ 1} Appellant, Jack Murphy, appeals from a judgment of the Bowling Green

Municipal Court denying his motion to suppress evidence and, following a no contest

plea, finding him guilty of operating a motor vehicle under the influence of alcohol or

drugs ("OVI").  For the following reasons, the trial court's judgment is affirmed.

## I. Facts and Procedural Background

{¶ 2} On February 14, 2022, a summons was filed requiring that Murphy, charged with one count of OVI, R.C. 4511.19(A)(1)(a) and (A)(1)(b), appear at a pretrial hearing. Murphy entered an initial not guilty plea and filed a motion to suppress the results of all field sobriety and breathalyzer testing. Murphy argued that no reasonable suspicion of impairment existed warranting continued detention and the request to perform field sobriety testing. He further argued that field testing was not conducted according to NHTSA standards. Finally, Murphy argued that no discovery was provided evidencing that the breath test machine was maintained in compliance with the Ohio Department of Health ("ODH") standards and that, upon information and belief, the dry gas control was not traceable to the National Institute of Standards and Technology ("NIST") standards.

{¶ 3} At the start of the May 31, 2022 suppression hearing, the parties discussed Murphy's claim that the state failed to produce documents evidencing the traceability of the dry gas control. The state noted that the reports were public record and available on the ODH website. It further argued that Murphy's claim was disingenuous and should be denied as he had not previously reviewed the materials at issue. The court reserved ruling until after the hearing.

{¶ 4} The following relevant testimony was then presented. On Saturday February 12, 2022, at approximately 1:00 a.m., Bowling Green State University Police Lieutenant Corey DiModica stopped Murphy for driving without headlights/taillights. DiModica's body camera was activated as he approached Murphy's vehicle and asked for his driver's

2.

license, registration, and proof of insurance. DiModica's testimony continued as a narrative of the body cam video.

{¶ 5} DiModica observed a distinct odor of alcohol coming from the vehicle, that Murphy's speech was slurred, he had difficulty maintaining eye contact, and he was fumbling with his documents. DiModica described that the odor of alcohol "hit" him as Murphy rolled down his window. There were no passengers in the vehicle and no evidence of an open container of alcohol. DiModica deduced that the odor was emanating from Murphy. Murphy denied consuming any alcoholic beverages.

{¶ 6} Lieutenant DiModica had Murphy exit his vehicle in order to perform field sobriety testing. DiModica first conducted the Horizontal Gaze Nystagmus ("HGN") test which tests for eye tracking and involuntary jerking. DiModica stated that six of the six clues were present suggesting that Murphy was impaired

{¶ 7} Due to the icy sidewalks and with his consent, Murphy was transported to a nearby college residence hall to continue field testing. The walk-and-turn test was administered next. Lieutenant DiModica explained that his training taught him to look for the subject starting too soon, balance problems, not walking heel-to-toe, counting steps incorrectly, improper turning, stepping off line, and prematurely stopping. DiModica stated that most of Murphy's steps did not touch heel-to-toe and that he took 19 steps out and 11 steps back instead of 9 each way as instructed. DiModica stated that Murphy's performance was indicative of being impaired.

3.

{¶ 8} DiModica proceeded to conduct the one-leg stand test which requires the individual to stand, feet together and arms at the side, and raise one foot approximately six inches off the ground and count to 30. Murphy put his foot down after seven which, according to DiModica, again demonstrated Murphy's impairment. Murphy then admitted to consuming two "legal joint" mixed drinks. Murphy was given his Miranda warnings and placed under arrest.

{¶ 9} During cross-examination, DiModica agreed that he stopped Murphy solely due to a lights violation and that he observed no erratic driving. Lieutenant DiModica was asked about the "coupon" Murphy allegedly gave him in lieu of his registration. Reviewing the documents, DiModica admitted that the "coupon" was, in fact, the vehicle registration but that it was printed on the reverse side which he did not review. DiModica also agreed that an odor of alcohol is not indicative of how much a person had consumed.

{¶ 10} Wood County Sheriff's Deputy Trey Farabee testified that on February 12, 2022, he administered Murphy's breath-alcohol test on an Intoxilyzer 8000 breath-testing machine. Farabee testified regarding his training and certification to operate the Intoxilyzer. He stated that breath test reports which are generated after each test as well as documents regarding the maintenance and calibration of the Intoxilyzer are publicly accessible on the ODH's website. These documents were admitted as state's Exhibits A-D. It is undisputed that Farabee did not author the documents.

{¶ 11} Farabee first testified regarding Exhibit A, the printout of Murphy's breath test results. He explained that two dry gas test controls, taken at 1:44 and 1:50 a.m.,

4.

registered a .001 difference. He did not recall the specific maximum acceptable deviation, but indicated that if it exceeded the number the machine would display an error code. The first subject breath sample was taken at 1:45 a.m. and read .182, the second sample was at 1:49 a.m., and registered at .182.

{¶ 12} Farabee stated that Exhibit B contained his access card number and certification to operate the Intoxilyzer. Farabee was questioned regarding the dry gas used as a test control. Farabee stated that the dry gas lot numbers on the certification report, Exhibit C, and Murphy's breath test report, Exhibit A, matched. He then read from the dry gas supplier ILMO's certificate of analysis, part of Exhibit D, which states at the bottom: "The calibration results within this certificate were obtained using equipment and standards capable of producing analytical results traceable to NIST." Finally, Farabee read from the March 16, 2021 diagnostic report, part of Exhibit D, demonstrating that the machine was operating properly and would remain in service; the test was certified by ODH inspector, Frank Nedveski.

{¶ 13} Throughout Farabee's testimony, objections were raised arguing lack of foundation and hearsay stemming from the fact that the preparer of the documents, specifically Exhibits C and D, was not available for questioning. The state countered that the documents were available on the ODH website and admissible under the public records hearsay exception. The court overruled the objections finding that they were admissible as business or public records.

5.

{¶ 14} On June 7, 2022, the trial court denied Murphy's motion to suppress. The court made six factual findings supporting Lieutenant DiModica's request that Murphy participate in field sobriety testing. The court first noted the time of day, 1:03 a.m. on Sunday morning.[1] Next, the court noted the observation of no headlights despite it being dark and the "distinct" odor of alcohol emanating from Murphy/the vehicle. The trial court concluded that testimony regarding Murphy's slurred speech was supported by the body cam video; specifically, the court noted that when he was asked where he was coming from Murphy slurred "Gassstation" and slurred/stuttered "near ahh Fffalcon Point." The court next noted that Murphy had red, glassy eyes. Finally, that Murphy had "difficulties with his paperwork" including "looking for 'new insurance' when DiModica already had his insurance card" and "failing to give DiModica the correct registration he had in his hand and instead giving DiModica an auto maintenance invoice as his registration." The court concluded that Officer DiModica has reasonable, articulable suspicion that Murphy was impaired.

{¶ 15} The trial court then addressed state's Exhibits A-D, relating to Murphy's breath testing and the Intoxilyzer 8000 used. The court found that the documents submitted by the state at the hearing demonstrated that the machine at issue was "calibrated and testing within the allowable variation and was operating correctly on February 12, 2022."

---

[1]The correct day was early Saturday morning but the discrepancy is not material.

6.

{¶ 16} Following the denial of his motion to suppress, Murphy entered a no contest plea and was sentenced on August 18, 2022. This appeal followed.

## II. Assignment of Error

{¶ 17} Murphy raises the following assignment of error:

Assignment of Error No. 1: The trial court erred when it failed to grant defendant's motion to suppress.

## III. Discussion

## A. Motion to Suppress Standard

{¶ 18} Appellate review of a motion to suppress, presents mixed questions of law and fact. *State v. Codeluppi*, 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, ¶ 7, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Internal citations omitted.) *Burnside* at ¶ 8.

## B. Reasonable Suspicion

{¶ 19} Murphy first argues that the trial court erred in failing to suppress the results of the sobriety testing because Lieutenant DiModica lacked reasonable suspicion to request that he submit to field sobriety testing. Murphy contends that Lieutenant DiModica's determination that his speech was slurred was erroneous and that bloodshot, glassy eyes and an odor of alcohol, standing alone, do not establish reasonable suspicion to commence field sobriety testing.

{¶ 20} The state counters that the testing was warranted based on the time of day, the day of the week, an odor of alcohol, slurred speech, glassy and bloodshot eyes, confused demeanor, and difficulty producing paperwork.

{¶ 21} Under Ohio law, a peace officer's extension of a consensual encounter to "request that a driver perform field sobriety tests 'must be separately justified by specific, articulable facts showing a reasonable basis for the request.'" *State v. Watkins*, 2021-Ohio-1443, 170 N.E.3d 549, ¶ 25 (6th Dist.), citing *State v. Trevarthen*, 11th Dist. Lake No. 2010-L-046, 2011-Ohio-1013, ¶ 15, quoting *State v. Evans*, 127 Ohio App.3d 56, 62, 711 N.E.2d 761 (11th Dist.1998). "Whether a request to perform field sobriety tests was reasonable is to be considered under the totality of the circumstances." *Id.*, citing *Trevarthen* at ¶ 15.

{¶ 22} In determining whether an officer had a reasonable suspicion to administer field sobriety testing, a court considers several factors, combined with an officer's experience with OVI investigations, including:

8.

"(1) the time and day of the stop (Friday or Saturday night as opposed to, e.g., Tuesday morning); (2) the location of the stop (whether near establishments selling alcohol); (3) any indicia of erratic driving before the stop that may indicate a lack of coordination (speeding, weaving, unusual braking, etc.); (4) whether there is a cognizable report that the driver may be intoxicated; (5) the condition of the suspect's eyes (bloodshot, glassy, glazed, etc.); (6) impairments of the suspect's ability to speak (slurred speech, overly deliberate speech, etc.); (7) the odor of alcohol coming from the interior of the car, or, more significantly, on the suspect's person or breath; (8) the intensity of that odor, as described by the officer ("very strong," "strong," "moderate," "slight," etc.); (9) the suspect's demeanor (belligerent, uncooperative, etc.); (10) any actions by the suspect after the stop that might indicate a lack of coordination (dropping keys, falling over, fumbling for a wallet, etc.); and (11) the suspect's admission of alcohol consumption, the number of drinks had, and the amount of time in which they were consumed, if given."

*State v. Martorana*, 6th Dist. Sandusky No. S-22-011, 2023-Ohio-662, ¶ 27, quoting *Evans* at f.n.2. Whether an officer has reasonable suspicion to conduct field sobriety testing is "very fact-intensive." *State v. Burkhart*, 2016-Ohio-7534, 64 N.E.3d 1004, ¶ 15 (4th Dist.).

**{¶ 23}** Murphy relies on multiple cases where this court concluded that no reasonable, articulable suspicion supported field sobriety testing.  First, in *State v. Stricklin*, 6th Dist. Lucas No. L-10-1277, 2012-Ohio-1877, this court concluded that reasonable suspicion was lacking where following a stop due to one functioning headlight, the officer observed a slight odor of alcohol and bloodshot, glassy eyes combined with "anxious" behavior.  *Id.* at ¶ 4, 15.  Similarly, in *Watkins*, 2021-Ohio-1443, 170 N.E.3d 549 (6th Dist.), the court found reasonable suspicion lacking where the officer's observations of the suspect during a 3:00 a.m. encounter included bloodshot, glassy eyes, an odor of alcohol of an unspecified strength, and an admission to having a glass of wine seven hours prior.  *Id.* at ¶ 37.

**{¶ 24}** Finally, in *State v. Dye*, 2021-Ohio-3513, 178 N.E.3d 584 (6th Dist.), the court concluded that in addition to a strong odor of alcohol and glassy, bloodshot eyes present under the facts, reasonable suspicion warranting field sobriety testing required "'*further indicia of intoxication.*'"  *Id.* at ¶ 68, quoting *State v. Beeley*, 6th Dist. Lucas No. L-05-1386, 2006-Ohio-4799, ¶ 16.  The *Dye* court further explained that such additional indicia of intoxication included "admission to consuming alcohol, slurred speech, and fumbling or searching for a driver's license or registration paperwork." *Id.*, citing *Beeley* at ¶ 17.

**{¶ 25}** Employing the *Evans* factors, the court concludes that the facts in the instant matter present the necessary indica of intoxication lacking in *Stricklin, Watkins,* and *Dye*.  The trial court found that the stop in this case occurred on an early weekend

10.

morning after Lieutenant DiModica observed Murphy driving without lights on. After initiating a traffic stop, DiModica noticed that Murphy had a distinct odor of alcohol, bloodshot and glassy eyes, slurred speech, and that he fumbled with his paperwork. Under the totality of the circumstances, DiModica had reasonable suspicion to conduct the field sobriety tests, and the trial court did not err in failing to suppress the results of the field sobriety testing.

### C. Traceability of the Dry Gas Standard

{¶ 26} Murphy's next argument is that the court erred by failing to suppress his Intoxilyzer 8000 breath test results because the state failed to present testimony regarding the traceability of the dry gas control used in the test to NIST standards.

{¶ 27} "In R.C. 4511.19(D)(1)(b), the legislature made the results of a breath-alcohol test presumptively admissible, provided that the sample is 'analyzed in accordance with methods approved by the director of health * * *' and the analysis is conducted by a person with the appropriate permit issued by the director of ODH." *State v. Farrell*, 2021-Ohio-1554, 172 N.E.3d 488, ¶ 18 (6th Dist.). "To trigger the presumption of admissibility in R.C. 4511.19(D)(1)(b), the state must establish that it substantially complied with the alcohol-testing regulations promulgated by ODH." *Id.* at ¶ 19. "If the state shows that it substantially complied with the applicable regulations, the results of the alcohol test are presumptively admissible, and the burden shifts to the defendant to rebut the presumption by demonstrating that he was prejudiced by the state's failure to strictly comply with the regulations." *Id.*

11.

**{¶ 28}** The performance standards for the Intoxilyzer 8000, the breath testing machine used in this case, are set forth in Ohio Adm. Code 3701-53-04(B) which, on the date of Murphy's test provided:

Instruments listed under paragraph (A)(3) of rule 3701-53-02 of the Administrative Code [including the Intoxilyzer 8000] shall automatically perform a dry gas control using a dry gas standard *traceable to the national institute of standards and technology (NIST) before and after every subject test*.

(Emphasis added.)

**{¶ 29}** Murphy relies on two recent decisions of this court addressing the ODH requirement that dry gas be traceable to NIST standards. *Farrell*, *supra*, and *Dye*, 2021-Ohio-3513, 178 N.E.3d 584. This court determined in both cases that the city failed to demonstrate substantial compliance with Ohio Adm. Code. 3701-53-04(B) because it did not present any evidence that the dry gas used was traceable to NIST standards as unambiguously required by the rule. *Farrell* at ¶ 30-31, *Dye* at ¶ 48-49.

**{¶ 30}** In this case, however, on the date of Murphy's breath test, the dry gas supplier's certificate of analysis, which was admitted into evidence at the suppression hearing and has not been challenged on appeal, stated that "[t]he calibration results within this certificate were obtained using equipment and standards capable of producing analytical results traceable to NIST * * *." Additionally, the dry gas lot numbers on Murphy's breath test report and the certificate of analysis matched. Thus, based on this

12.

documentary evidence, the state demonstrated substantial compliance with Ohio Adm. Code 3701-53-04(B) and additional testimony was unnecessary. Pursuant to R.C. 4511.19(D)(1)(b), therefore, the results of Murphy's breath test on the Intoxilyzer 8000 were presumptively admissible. Because Murphy failed to rebut this presumption, the trial court did not err in denying the motion to suppress Murphy's breath test results. Murphy's assignment of error is not well-taken.

### IV. Conclusion

{¶ 31} Upon due consideration, the August 18, 2022 judgment of the Bowling Green Municipal Court is affirmed. Pursuant to App.R. 24, Murphy is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.  
_____  
JUDGE  
Gene A. Zmuda, J.

_____  
Charles E. Sulek, J.  
JUDGE  
CONCUR.

_____  
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.